*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0282P (6th Cir.)
File Name: 03a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DIANNA FERGUSON WEAVER,
individually and as
Administratrix of the Estate of
Stephen Lamont Weaver,
   *Plaintiff-Appellee,*

  *v.*

WARREN SHADOAN and
VICTOR OWEN, in their
individual and official
capacities as officers of the
City of Oliver Springs,
Tennessee Police Department,
  *Defendants-Appellants.*

No. 01-5656

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 98-00631—James H. Jarvis, District Judge.

Argued: October 31, 2002

Decided and Filed: August 13, 2003

Before: SILER and DAUGHTREY, Circuit Judges;
ALDRICH, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** John C. Duffy, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, for Appellants. Herbert S. Moncier, LAW OFFICES OF HERBERT S. MONCIER, Knoxville, Tennessee, for Appellee. **ON BRIEF:** John C. Duffy, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, for Appellants. Herbert S. Moncier, Ursula Bailey, LAW OFFICES OF HERBERT S. MONCIER, Knoxville, Tennessee, for Appellee.

SILER, J., delivered the opinion of the court, in which ALDRICH, D. J., joined. DAUGHTREY, J. (pp. 26-29), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

SILER, Circuit Judge. Defendants, Officers Warren Shadoan and Victor Owen (collectively, the "Officers"), appeal the district court's denial of their motion for summary judgment based on qualified immunity on claims brought pursuant to 42 U.S.C. § 1983. Dianna Ferguson Weaver ("Plaintiff"), Administratrix of the Estate of her son, Stephen Lamont Weaver ("Weaver"), filed a civil rights action alleging that Weaver was arrested without probable cause, and that the Officers were deliberately indifferent to the serious medical needs of Weaver, who died in police custody

———————————

[*]The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

after voluntarily ingesting a lethal dose of cocaine and then repeatedly denying his ingestion of the drugs and refusing medical treatment. The district court found that questions of material fact remained to be determined. After carefully reviewing the record, and drawing all reasonable inferences in favor of Plaintiff, we find that Weaver's Fourth and Eighth Amendment rights were not violated. Therefore, we **REVERSE** the ruling by the district court and **REMAND** for the court to grant summary judgment to the Officers in their individual capacities.

## BACKGROUND

On October 18, 1997, Shadoan, an officer with over fourteen years of police experience, was on patrol in Oliver Springs, Tennessee, when he observed an unfamiliar vehicle at the residence of David Futtrell, an individual who cooperated with Shadoan during a burglary investigation at Futtrell's residence a few months earlier. Shadoan was aware that Futtrell was having trouble with some black men. Because Shadoan had just seen Futtrell at the Town and Country Market, and thus knew that Futtrell was not at home, he became suspicious of the unfamiliar vehicle. He then observed a black man walking out of the front door of Futtrell's residence and enter into the vehicle in question.

Shadoan approached the vehicle to get the license plate number, but the vehicle did not have a license plate. It did, however, have dark tinted windows with a temporary tag behind the rear window. Shadoan allegedly had difficulty reading the temporary tag because of the dark window tint. Nonetheless, Shadoan thought the temporary tag was expired, bearing the date 10-17-97. The vehicle then turned into and stopped at the Town and Country Market. Believing that the tag was expired, that the window tint was too dark, and that there may have been criminal activity at the Futtrell residence, Shadoan drove his cruiser into the Town and Country Market and turned on his blue lights behind the stopped vehicle.

Weaver exited his vehicle and met Shadoan at the rear of the car. Weaver inquired as to why he was being stopped and Shadoan indicated it was because of the car's expired tag. Weaver responded that his tag was not expired, pointing out that the alleged 7 was in fact a 9. Upon closer examination, Shadoan confirmed that the tag had not expired. Shadoan then asked why Weaver and his passenger, William Booker, were at the Futtrell residence. Weaver first stated that he had picked up Booker from nearby Oak Ridge, Tennessee, had gone to Clinton, Tennessee, and that the two were now on their way back to Oak Ridge. Shadoan pointed out, however, that the location of Futtrell's residence was inconsistent with this story. Weaver then stated that he did not know what Booker and he were doing at Futtrell's residence. During this questioning, Weaver was allegedly becoming increasingly nervous. Shadoan claims that Weaver was rubbing his hands together, clutching his arms and shuffling his feet. Weaver's behavior, in conjunction with his responses, raised suspicions for Shadoan. According to Shadoan, even though the temporary tag had not expired, he did not consider the traffic stop over. It was his view that the temporary tag was not lawfully displayed due to the dark tinted windows.

Some time during this questioning, Owen arrived on the scene.[1] Weaver then left the Officers' presence and went into the Town and Country Market. During this time, Shadoan questioned Booker, who explained that the reason he was at the Futtrell residence was to collect some money from David Cooper. Cooper was known by Shadoan to be engaged in the distribution of marijuana and cocaine out of his home, which was located near the Futtrell residence. Booker also provided Shadoan with information that was not entirely consistent

---

[1]Owen, also on patrol for the Oliver Springs Police Department, heard Shadoan announce his traffic stop over the police radio and decided to assist Shadoan. Apparently, it is customary for Oliver Springs police officers to assist one another if not busy.

with that provided by Weaver. He also presented the Officers with false identification.

Coincidentally, during this questioning, Futtrell came out of the Town and Country Market. The Officers asked Futtrell what he knew regarding either Weaver or Booker. Futtrell told the Officers that neither Weaver nor Booker had any business being at his residence and that they were probably looking for the Cooper residence to sell cocaine. Futtrell's statements, in addition to Weaver's inability to explain his presence at Futtrell's residence, raised Shadoan's suspicion that Weaver was involved in drug activity.[2]

Approximately ten to fifteen minutes into the stop, Shadoan asked Weaver for permission to search his automobile and person.[3] It appears that Weaver consented to the search. According to Shadoan, at this point, Weaver began clenching and unclenching his fists and acting very nervous.

Shadoan conducted a pat-down search of Weaver and noticed a lump in one of Weaver's pockets, which he believed

---

[2] Plaintiff asserts that Shadoan had no basis to believe that Futtrell was a reliable informant or that Futtrell's suspicion was reliable. This point is factually inaccurate. The record shows that Futtrell had cooperated with the police in a prior police investigation of a burglary at his residence, and had cooperated in an investigation of a drive-by shooting.

[3] Plaintiff alleges that Booker's affidavit indicates that Shadoan did not request permission to search Weaver. Booker's affidavit, however, only states that "[a]t no time did I hear either of the officers ask Lamonte Weaver to search either Lamonte Weaver or the car." Therefore, contrary to Plaintiff's position, Booker's statement does not create a factual dispute--it eliminates it. In effect, Booker merely alleges that he has no knowledge of the Officers' conversation with Weaver regarding consent. Thus, Plaintiff has not presented any evidence to refute Shadoan's assertions that he received Weaver's consent to search his person and automobile.

---

to be the size of five or six rocks of crack cocaine.[4] According to Shadoan, when asked about the lump, Weaver stated that it was a "wad of paper." At this point, Shadoan considered Weaver to be under arrest--although he did not state so. Shadoan then asked Weaver to empty his pockets, at which time Weaver suddenly began running from the scene. The Officers chased Weaver and, with the help of a bystander, took him into custody. The Oliver Springs Police Department radio log reflects that the traffic stop of Weaver and Booker occurred at 4:54 p.m., with the foot pursuit occurring at 4:58 p.m.

After handcuffing Weaver, the Officers then checked Weaver's pockets but found no drugs. Shadoan asked Weaver where the drugs were, but Weaver did not respond. As the Officers began walking Weaver back to the cruiser, they noticed that Weaver appeared to have something in his mouth. Neither Officer saw Weaver place anything in his mouth. Weaver then refused Shadoan's request to open his mouth. Shadoan tried to get his fingers in Weaver's mouth, while simultaneously telling him not to swallow whatever it was he had. Weaver then appeared to swallow something.

Weaver was placed in the back of Owen's cruiser. He was reported in custody at 5:10 p.m. After retracing the path of

---

[4] Plaintiff supplies an affidavit from Fermin De La Torre, a former Oliver Springs dispatcher, which states that later on in the evening, after the entire facts of this case had played out, Grant Lowe, Police Chief of the Oliver Springs Police Department, stated that "Shadoan could not have known what the lump was in Weaver's pocket because Officer Shadoan had no way to tell what was in Mr. Weaver's pocket." This conclusory statement, even assuming it was made, does not support an inference that Shadoan did not identify rocks of crack cocaine in Weaver's pocket. Chief Lowe was not present at the scene of the Weaver arrest. Also, Plaintiff has not directed this court to any evidence that Shadoan made a statement to Chief Lowe indicating he had fabricated his suspicion as to the presence of crack cocaine. Therefore, Chief Lowe cannot possibly know what Shadoan felt and what conclusions Shadoan drew from his pat down of Weaver.

the chase, the Officers discovered a piece of cellophane wrapper, which they believed contained a residue with the appearance of crack cocaine. Later lab tests conducted by the Tennessee Bureau of Investigation did not identify the substance as crack cocaine.

Booker stayed in the car during the chase and capture. He was charged with public intoxication. Weaver was charged with evading arrest and drug possession. Both men were transported in Owen's cruiser to the Oliver Springs Police Department, where Weaver was placed in a holding cell. There is no evidence to suggest that during the approximately forty-five minutes to one hour that Weaver was at the station, the Officers noticed any change in Weaver's condition.

According to Police Chief Lowe, an agreement between the Oliver Springs Police Department and Morgan County required both men to be transported to the Morgan County Jail.[5] Therefore, Weaver and Booker were again placed in Owen's cruiser for transportation to the Morgan County Jail. As Owen began pulling out of the station, Weaver asked what the Officers were going to do with the piece of cellophane that had been found at the arrest scene. Owen replied that the evidence would be sent to the lab, and that if the results came back positive, charges would likely be filed. According to

---

[5] Plaintiff asserts, however, that according to an affidavit provided by James N. Ramsey, District Attorney General for the Seventh Judicial District, Weaver and Booker should not have gone to the Morgan County jail, but instead, should have been transferred to the Anderson County Jail and appeared before an Anderson County Magistrate. The district court addressed this alleged due process violation and granted summary judgement to all defendants on the issue. The district court found that even assuming a due process violation, "there is no proximate cause between the alleged denial of due process and the decedent's death. Even if Mr. Weaver had gone to another jail but refused to go to the hospital, he would no doubt have still died." The court also found as "speculative" Plaintiff's claim that Weaver would not have died had he been sent to the Anderson County Jail. This issue is not properly before us during this interlocutory appeal. Accordingly, we decline to address it.

Owen, "[a]t that point he immediately started shaking violently" as if he was having a "seizure," and then he became "slumped over in the seat." This testimony was later supported by Booker, who stated in his affidavit that "Lamonte [Weaver] began to get sick and was jerking in the back seat of the police cruiser." At 6:42 p.m., approximately one hour and thirty-two minutes after Weaver was in custody, Owen requested an ambulance to come to the police station to examine Weaver. While waiting for the ambulance, Shadoan checked on Weaver's condition. Although Weaver's eyes were closed and he was not responding to questions, he had a strong heartbeat and he appeared to be breathing normally.

The Emergency Medical Technicians/paramedics arrived at the Oliver Springs Police Department and examined Weaver. One paramedic had twelve years of experience; the other had ten years. Although the Officers had not seen Weaver ingest any drugs, Shadoan requested that Weaver be assessed for "possible drug reaction and/or overdose." It appears that neither of the paramedics called to the scene had experience with treating someone who had swallowed cocaine. Also, apparently, there is no paramedic protocol for responding to the situation. Generally, paramedics would not be expected to know how to treat someone who had ingested cocaine other than to contact medical control and perhaps help induce the individual to vomit.[6]

Despite numerous attempts by paramedics, Weaver refused treatment. When asked if he wanted to go to the hospital, Weaver responded, "No, I want to go to jail, and I haven't taken nothing. Leave me alone." Weaver also insisted, in

---

[6] The record is absent of physician testimony regarding what treatment would have been available to Weaver had he been willing to accept it. Plaintiff's only medical evidence is from a pharmacist, who stated that he would expect seizures with a cocaine overdose, and that common treatment would include a gastric lavage or stomach pump, which typically must be performed in a hospital emergency room.

front of the presence of the Officers, that he had not swallowed any drugs. For instance, one paramedic stated that Weaver repeatedly said "'no,' 'no,' 'no,'" to being asked if he had ingested drugs. Booker's affidavit confirms Weaver's responses.

Weaver was assessed separately by both paramedics, who found that there was no need for emergency treatment. According to the paramedic report, Weaver was conscious, alert, and oriented as to person, place and time.[7] Despite his apparently good physical condition, the paramedics explained to Weaver that there were serious consequences to swallowing drugs, including death.

The paramedics then relayed their assessment to the Officers. The paramedics told them that "[i]f you see any other problems or anything at all, changes, call us back." According to one paramedic, he told the Officers to monitor Weaver, and immediately contact for help if they noticed any changes in Weaver. Although the paramedics were informed that Weaver was going to be transported to the jail, there is no indication that the paramedics objected to this course of

---

[7]Weaver also had good vital signs. His pupils were equal and reactive to light. He was not post-dictal, meaning he exhibited no signs or symptoms of a seizure. He had normal jugular vein distentions, thereby indicating an absence of severe heart abnormalities. He had clear breath sounds, good skin color and a normal temperature. He had good capillary refill, which means that good/normal blood change was taking place. He also had a normal midline trachea, which normally gets misaligned on severe lung difficulties from trauma. Furthermore, Weaver had movement and sensation in all four extremities.

action, or recommended otherwise.[8] Unable to force treatment upon Weaver, the paramedics left.

At 7:00 p.m., Owen *alone* proceeded to transport Weaver and Booker to the jail. At this point, Weaver had been in custody for one hour and fifty minutes. The jail is approximately twenty to twenty-five minutes from the Oliver Springs Police Department.

According to Booker, Weaver began to get sick and throw up within five minutes of leaving for the jail. Booker asserts that although he told Owen at least three times that Weaver needed to be taken to the hospital, Owen ignored his requests and continued to drive. Booker claims that by the time the cruiser arrived at the jail, Weaver was mumbling, could not walk, had to be carried into the jail, and was generally almost "out of it." Two jailers assisted Weaver out of the car and into the jail. Owen, however, declined ambulatory services for Weaver. Apparently, Owen believed that Weaver was "faking" his illness, a belief that he shared with some of the jailers. Weaver and Booker were then placed into a jail cell. Shortly thereafter, Teresa Hamby, the chief jailer and a certified EMT, was paged by Owen, who was then her boyfriend and now her husband.[9] According to Hamby, she

---

[8]There is another ambulance service in the small community of Wartburg, which is where the jail is located. There is also a medical center located approximately fifteen miles from the Morgan County Jail. Plaintiff points out, however, that at the time of these facts, the jail had been found by a Department of Justice investigation to be unconstitutional due to lack of necessary and adequate medical facilities and personnel. Plaintiff does not allege, though, that the Officers had any knowledge of the Department's finding.

[9]Plaintiff alleges that the reason (or at least one of the main reasons) Weaver was transported to the Morgan County Jail was so that Owen could meet Hamby, his girlfriend. The record does not support this allegation. The record shows, instead, that Oliver Springs police officers were required by Chief Lowe to transport arrestees to the Morgan County Jail.

looked at Weaver and noticed that his chest was rising and falling and thus believed that Weaver was breathing.

Booker estimates that Weaver was in the jail cell for fifteen to twenty minutes before anyone checked on him. The record log indicates that it was approximately 7:39 p.m. when Owen requested the jailers to summon another ambulance for Weaver. This request was thirty-nine minutes after Weaver had first refused treatment from the paramedics at the Oliver Springs Police Department. The ambulance arrived thirteen minutes later, by which time Weaver had lost consciousness and was not breathing. Upon arrival, the paramedics began to administer CPR on Weaver. Weaver was then transported to the Roane Medical Center, approximately fifteen miles from the Morgan County Jail, where he was pronounced dead. An autopsy performed on Weaver indicated that the cause of death was ingestion of a lethal amount of cocaine.

Plaintiff sued Shadoan and Owen in their individual and official capacities under 42 U.S.C. § 1983 and state law. At issue in this appeal are Plaintiff's claims that Weaver was arrested without probable cause and that the Officers were deliberately indifferent to Weaver's serious medical needs. The district court denied summary judgment to the Officers on Plaintiff's Fourth and Eighth Amendment claims.

### STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). In deciding a summary judgment motion, we cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We must, however, view the evidence and draw all "justifiable inferences" in the light most favorable to the non-movant. *Id.* Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

Mixed questions of law and fact are reviewed *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (1999) (*en banc*). A district court's findings of ultimate facts, based upon the application of legal principles to subsidiary facts, are also subject to *de novo* review. *Id.*

### JURISDICTION

In a separate motion, Plaintiff has moved this court to dismiss the Officers' interlocutory appeal for lack of jurisdiction. Plaintiff argues that the district court's memorandum opinion establishes the existence of genuine issues of material fact. The district court found that "there is a question of material fact with respect to whether the officers had probable cause to arrest Mr. Weaver for [possession of cocaine or evading a lawful arrest]." With regard to the Eighth Amendment claim of deliberate indifference, the district court found that "[q]uestions of material fact remain to be determined with respect to whether, under the circumstances, those two defendants showed deliberate indifference to their prisoner's serious medical needs by failing to take further steps to insure his safety and whether that failure may have been a proximate cause of the prisoner's death." On appeal, however, the Officers have asked us to assume as true Plaintiff's version of any disputed facts. Because we accept Plaintiff's version of any disputed subsidiary facts, we hold that jurisdiction is proper pursuant to 28 U.S.C. § 1291.

Under 28 U.S.C. § 1291 we have jurisdiction to hear an appeal only from a district court's "final decision." The Supreme Court has held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the

meaning of . . . § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). It is well recognized that a defendant's "right to appeal the denial of qualified immunity does not turn on the phrasing of the district court's order." *Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir. 1995). Therefore, "regardless of the district court's reasons for denying qualified immunity, we may exercise jurisdiction over the appeal . . . to the extent it raises questions of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

As we have explained in our en banc decision in *Williams*, there is a distinction between an ultimate fact and a subsidiary or basic fact. 186 F.3d at 690. An ultimate fact is a mixed issue of law and fact. *Id.* Mixed questions are treated as legal questions, not factual questions. *Id.* Questions concerning a defendant's conduct or the existence or non-existence of certain evidence are questions of subsidiary or basic facts. *Id.* In this case, examples of questions of basic facts would include: Was Weaver's temporary license plate placed behind his vehicle's tinted rear window? Did the Officers know that Weaver had ingested cocaine? Did Weaver deny having ingested cocaine? Was Weaver offered the opportunity to receive treatment? Dispute as to these material basic facts would divest this court of interlocutory appellate jurisdiction. For purposes of this appeal, however, the Officers have not disputed the Plaintiff's version of the basic facts.

The questions at issue in this case, namely, whether certain facts gave rise to probable cause for an arrest, and whether the Officers' specific actions, as alleged by the Plaintiff, could constitute deliberate indifference, are mixed questions of law and fact. Therefore, because the subsidiary facts are not in dispute for purposes of this appeal, this court's "decision turns on a question of law: whether the alleged facts, admitted for this purpose, show a violation of clearly established law." *Id.* Seen in this light, the district court's denial of qualified immunity is a final order as required by 28

U.S.C. § 1291. We, therefore, have jurisdiction to decide this case on the merits.

## ANALYSIS

The doctrine of qualified immunity shields public officials acting within the scope of their official duties from civil liability. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526 (emphasis in original). The Supreme Court has emphasized that questions of qualified immunity should be resolved "at the earliest possible stage in the litigation." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). The Supreme Court has recently set forth a two-prong test that must be applied to a qualified immunity analysis. *Id.*

The first prong is a threshold question, namely: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* If the answer is in the negative, then the inquiry ends. If a violation could be established, the second prong requires an examination of whether "the right was clearly established" at the time of the events at issue. *Id.* In order for a right to be clearly established, the "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. As the Court explained, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

### 1.   Fourth Amendment Claim

The district court concluded that because the Officers did not find any cocaine after Weaver was captured following his attempted escape, probable cause to arrest did not exist. The district court also concluded that, irrespective of Shadoan's subjective belief regarding Weaver's arrest, objectively, Weaver was not aware that he was under arrest at the time that he fled from the Officers, and, therefore, probable cause did not exist to arrest him for evading a lawful arrest. The Officers argue that Weaver's Fourth Amendment rights were not violated because the traffic stop was supported by reasonable suspicion, and information developed during the course of the stop provided probable cause to support an arrest. We find that although the Officers lacked probable cause to arrest Weaver for evading arrest, the Officers had probable cause to arrest Weaver for drug possession. Accordingly, Weaver's Fourth Amendment rights were not violated.

Police officers may briefly stop an individual for investigation if they have reasonable suspicion that the person has committed a crime. *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999). An ordinary traffic stop is more "akin to an investigative detention rather than a custodial arrest." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied,* 528 U.S. 1176 (2000). Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Houston*, 174 F.3d at 813 (alterations in original) (internal quotations and citation omitted). It requires "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Moreover, reasonable suspicion "can arise from evidence that is less reliable than what might be required to show probable cause." *Id.*

The existence of reasonable suspicion must be viewed in the "totality of the circumstances." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*), *cert denied,* 525 U.S. 1123 (1999). This means that a court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). Moreover, it is well-settled that the legality of a traffic stop is not dependent upon an officer's subjective intentions. *Whren v. United States*, 517 U.S. 806, 813 (1996).

In the instant case, it is clear that Shadoan had reasonable suspicion to stop Weaver. The record clearly indicates that Shadoan believed that Weaver's registration was either invalid or improperly displayed behind darkly tinted windows, violations of Tennessee's vehicle registration and window tinting laws. T.C.A. §§ 55-4-110, 55-9-107(a). Shadoan, therefore, was justified in conducting an ordinary traffic stop of Weaver's automobile.

Once the "purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Hill*, 195 F.3d at 264. The Supreme Court has recognized that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). *See also United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) (explaining that "nervousness is generally included as one of several grounds for finding reasonable suspicion"). Lying about travel plans can also form a basis for reasonable suspicion. *Hill*, 195 F.3d at 272. An officer's doubt regarding expressed travel plans or the purpose of a trip can also be bolstered by a passenger's inconsistent statements. *Id.*; *United States v. Johnson*, 58 F.3d 356, 357-58 (8th Cir.), *cert. denied,* 516 U.S. 936 (1995).

In the instant case, the record clearly shows that Shadoan, and later, Owen, had  reasonable suspicion to continue to detain Weaver after Shadoan determined that Weaver's car tag was not expired.  The following factors support a finding of reasonable suspicion:  (i) Shadoan's observation that Weaver's automobile was at Futtrell's residence at a time when Shadoan knew Futtrell was not home; (ii) an awareness that Futtrell's residence had been burglarized, and that he was having trouble with some black men; (iii) Shadoan's observation of a black man leaving Futtrell's residence and entering into an unfamiliar vehicle; (iv) Weaver's inability to explain his presence at Futtrell's residence; (v) Weaver's alleged travel plans, which were inconsistent with his current location; (vi) Futtrell's corroboration that Weaver and Booker had no reason to be at his home; (vii) Futtrell's suggestion that Weaver and Booker were probably looking for the Cooper residence to sell cocaine; and (viii) Weaver's nervousness and demeanor.  When viewed in the totality of circumstances, the Officers were justified in detaining Weaver and Booker to continue to conduct an investigative stop.

An investigative *Terry* stop may ripen into a *de facto* arrest through the passage of time or the use of force. *Houston*, 174 F.3d at 814.  When this occurs, a suspect's continued detention must be based upon probable cause. *Id.* Although a bright-line test has not been formulated to distinguish between an investigative stop and a *de facto* arrest, "the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion." *Id.* In the present case, it is clear that Weaver's detention did not ripen into a *de facto* arrest.  First, the duration of the investigative detention from the moment of the initial stop until Weaver fled on foot lasted four minutes according to the police log and approximately ten to fifteen minutes by Booker's estimate. *See, e.g., United States v. Wellman*, 185 F.3d 651, 656-57 (6th Cir. 1999) (finding that a fifteen to twenty minute traffic stop was a lawful detention); *Houston*, 174 F.3d at 815 (finding that in certain circumstances, such as when officer safety is a serious concern, a detention of thirty-

five minutes or even an hour was reasonable).  Second, Weaver was free to leave the presence of the officers to enter into the Town and Country Market. *See California v. Beheler*, 463 U.S. 1121, 1121 (1977) (per curiam) (holding that a person is not in custody if "the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview"); *cf. Houston*, 174 F.3d at 815 (finding that when officer safety is at issue, handcuffs and detention in a cruiser do not exceed the bounds of a *Terry* stop).  Given these undisputed facts, Weaver's detention prior to the search of his person did not amount to an arrest or an otherwise unlawful detention.

In the chronology of events, next came Shadoan's search of Weaver.  The district court concluded that Weaver was not yet under arrest at the point that Shadoan allegedly felt the contours of crack cocaine in Weaver's pocket.  Although Shadoan may have believed that Weaver was under arrest, the district court found that Shadoan did not convey this to Weaver.  Then, the district court reasoned that Weaver could not properly be charged with evading a lawful arrest when he fled from the police.  The Officers themselves do not dispute this logic.  In fact, they insist that Weaver was not under arrest at the time of the search.  Therefore, as there is no dispute that Weaver was not under arrest at any time prior to his flight, the Officers lacked probable cause to arrest Weaver for evading a lawful arrest.  However, they had probable cause to arrest Weaver for possession of cocaine.

We have held that "[a] law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and . . . request[s] for consent to search the individual's vehicle." *Erwin*, 155 F.3d at 823.  Before an officer turns his back on a suspect, an officer may, during a lawful *Terry* stop, conduct a limited pat-down search for concealed weapons if the officer reasonably believes that a suspect may be dangerous. *See United States v. Walker*,

181 F.3d 774, 778 (6th Cir.), *cert. denied,* 528 U.S. 980 (1999). "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons . . . ." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Moreover, "if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id.* at 375-76. Thus in *Walker*, when a pat-down search indicated that a person had crack cocaine concealed under his pants, a subsequent strip search was lawful. 181 F.3d at 778-79. Walker is highly analogous to the facts of this case.

In the instant case, Shadoan conducted a pat-down of Weaver. During his pat-down, Shadoan felt something that led him to believe was crack cocaine. When Shadoan asked Weaver to empty his pockets, Weaver fled. The Supreme Court has recognized that headlong flight from police presence is the consummate act of evasion and suggestive of wrongdoing. *See Wardlow*, 528 U.S. at 124 (stating that "[h]eadlong flight--wherever it occurs--is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"); *see also United States v. Dotson*, 49 F.3d 227, 231 (6th Cir.), *cert. denied,* 516 U.S. 848 (1995) (finding that a defendant's efforts to flee, coupled with a detective's reasonable suspicion of defendant's involvement in wrongdoing, established probable cause to arrest). Therefore, Shadoan's discovery of what appeared to be crack cocaine during the lawful *Terry* stop, coupled with Weaver's headlong flight from the scene, established probable cause for Weaver's arrest. Accordingly, the Officers did not violate Weaver's Fourth Amendment rights. Because Plaintiff did not satisfy the first prong of the qualified immunity analysis, we need not address whether the right was clearly established. The district court is thereby reversed on the issue of qualified immunity on the Fourth Amendment claim.

## 2.   Eighth Amendment Claim

The Eighth Amendment does not apply to pretrial detainees. *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). The Fourteenth Amendment's Due Process Clause, however, affords pretrial detainees a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners. *Id.* In the context of medical care for prisoners and detainees, it is well established that "deliberate indifference to a prisoner's [or detainee's] serious illness or injury states a cause of action under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

The Supreme Court has equated deliberate indifference with "criminal recklessness." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). That is, a defendant must know of and disregard a substantial risk of serious harm. *Id.* The inquiry is subjective: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* It is insufficient for a plaintiff to allege that there existed a danger that an officer should have been aware of. *Id.* at 838. Deliberate indifference is something more than negligence. *Id.* at 835. Also, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Very recently, a panel of this court decided a case squarely on point with the facts and issues presented by Plaintiff's Eighth Amendment claim. *See Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2002). In *Watkins*, officers executed a search warrant at the apartment of a suspected mid-level drug dealer. Upon entry, they found the suspect exiting a walk-in closet. Inside the closet was a torn plastic bag with white crumbs sprinkled around it and nearby was a larger piece of white substance, which was later identified as crack cocaine. Officers saw the subject licking his lips and a

pink foamy drool coming from his mouth. The officers also observed a white speck near his mouth. The officers, however, did not see the suspect place drugs into his mouth. The officers warned the suspect that he could die if he had swallowed cocaine and they offered to take him to the hospital. The suspect, however, repeatedly denied swallowing any drugs and refused medical treatment. The officers failed to inform the jailers or their supervisors of what they observed and of their suspicion that the suspect may have swallowed cocaine. Once at the jail, the suspect complained of an upset stomach and appeared to be intoxicated. The suspect was again offered medical treatment, which he continued to reject. At no time while he was conscious did the officers or jailers summon paramedics to examine the individual. Later, the suspect was found dead in his cell.

Based on these facts, this court found that it was not enough for the plaintiff to demonstrate that the police officers *should have known* that the suspect had ingested cocaine.[10] *Id.* at

---

[10]The dissent noted that the "only" possible means for destroying the drugs under the circumstances was for the suspect to ingest the drugs while in the closet. 273 F.3d at 688 (Moore, J., dissenting). The facts of *Watkins* clearly present a closer case for an Eighth Amendment violation than the facts of the instant case. In *Watkins*, stronger facts suggested that the suspect had ingested cocaine. Also, in *Watkins*, the officers and jailers never summoned the paramedics to assess the suspect while he was still conscious. The officers simply took the suspect's denials of ingesting drugs at face value. In the instant case, the arrest of Weaver took place outside, after he had fled from the police and was out of sight for several seconds. The most logical means for Weaver to have discarded the drugs would have been for Weaver to toss the drugs on the ground as he was fleeing. When the Officers retraced the path of Weaver's attempted escape, they found a cellophane wrapper with a drug-like residue, which they believed belonged to Weaver. Although it is unclear whether the wrapper belonged to Weaver, their recovery of the wrapper supports an inference that the Officers believed that Weaver had discarded the drugs along with the wrapper. Also, there is no evidence to suggest that the Officers observed a white substance in the area of Weaver's mouth. Weaver also exhibited no signs--such as a pinkish frothy drool--of drug

686. Because the officers did not see the suspect ingest any cocaine, the court found that there was insufficient evidence to lead a rational trier of fact to conclude that the officers or jailers knew the suspect needed medical attention for drug ingestion. *Id.* The situation did "not involve an incapacitated detainee or one who asked for but was refused medical treatment." *Id.* We found no fault in the officers' "not forcing medical treatment on [the suspect] in the face of his repeated denials and plausible explanations." *Id.* Consequently, there was no Eighth Amendment violation.

In the instant case, the Officers did not see, or otherwise have knowledge, that Weaver ingested cocaine. It is also undisputed that Weaver repeatedly denied swallowing any drugs. When Weaver appeared to become ill, the Officers immediately summoned the paramedics. The paramedics were requested approximately one hour and thirty-two minutes after Weaver was placed in custody. Plaintiff does not dispute Shadoan's assertions that while waiting for the ambulance, he checked Weaver's heartbeat and breathing, both of which appeared normal--and an indication that Shadoan was concerned for Weaver's health. The paramedics' report clearly indicates that Weaver did not exhibit any symptoms of drug ingestion. It is also undisputed that Weaver refused to be taken to a hospital. Given these facts, it can hardly be said that the Officers acted with deliberate indifference.

Plaintiff's contention that the Officers "believed" or "should have known" that Weaver had swallowed drugs does not give rise to a deliberate indifference claim. It is equally plausible that the Officers "believed" that Weaver had tossed out the drugs as he fled from the police. When dealing with

---

ingestion. Moreover, unlike the officers in *Watkins*, the Officers summoned paramedics to examine Weaver, who was cleared for transportation.

medical care for detainees, negligence does not state a cause of action under § 1983.

Shadoan's last dealings with Weaver was at the Oliver Springs Police Station when the paramedics were first summoned to assess Weaver. When Shadoan last saw Weaver, Weaver was alive and did not show any signs of illness. Based on these undisputed facts, and our decision in *Watkins*, we reverse the district court's denial of qualified immunity for Officer Shadoan on Plaintiff's Eighth Amendment claim.

With regard to Owen, Plaintiff asserts that Owen exhibited deliberate indifference toward Weaver when during his transportation of Weaver to the jail, he failed to call the paramedics a second time, and failed to turn back when Weaver began falling over and throwing up. Plaintiff also asserts that Owen acted with deliberate indifference when he told the jailers that he believed Weaver was "faking." We disagree.

When the paramedics were first called to the police station Weaver went from exhibiting seizure-like symptoms to being alert, oriented, coherent, and medically cleared for transportation to jail. Based on this first episode, it would not be unreasonable for Owen to discount the significance of Weaver's second set of symptoms during his transportation to the jail.[11] Also, earlier, Weaver had fled on foot at the arrest

---

[11]The dissent's analysis is premised on an assumption that Owen had *knowledge* that Weaver ingested drugs. According to the dissent, "Owen's failure to seek prompt medical assistance or advice when Weaver's condition deteriorated constitutes deliberate indifference because it was an unreasonable response to a *known risk* of serious harm." (Emphasis added). However, the dissent points to nothing, and we have been unable to find anything, that supports such an inference of knowledge. In fact, earlier in its analysis, the dissent acknowledges that "[t]he record reveals that neither officer saw *nor otherwise had knowledge* that Weaver had ingested cocaine." (Emphasis added). At best, the record supports an inference that Owen should have known (i.e., that he

---

scene. Owen's fear that Weaver could feign illness and then flee again is not deliberate indifference. Further, the fact that Owen believed that Weaver was faking his illness does not support an inference that Owen acted with deliberate indifference. To the contrary, Owen's "faking" statements suggest that he did not draw an inference or have the subjective belief that Weaver was in a substantial risk of serious harm.[12] Finally, Owen's request for a second ambulance for Weaver thirty-nine minutes after the first team of paramedics had finished examining him suggests that Owen was concerned for Weaver's health. Although Owen could have called an ambulance earlier in the process, he did request that Chief Jailer Hamby, a certified EMT, check on Weaver. In short, we find that Owen did not know and disregard a substantial risk of serious harm to Weaver. Accordingly, we hold that Owen did not violate Weaver's Eighth Amendment rights. Because Weaver's constitutional rights were not violated, it is unnecessary to address whether the right was clearly established. The district court is

---

suspected) that Weaver consumed drugs. To this, the dissent apparently concedes, "[w]hen Weaver became ill, the officers immediately summoned the paramedics, indicating that they did indeed *suspect* that he had swallowed the drugs." (Emphasis added). Without more, the mere suspicion of a risk of harm is insufficient as a matter of law to give rise to liability for deliberate indifference.

[12]The dissent rejects that Owen had a belief that Weaver was "faking" his illness. In the dissent's view, if Owen "truly believed Weaver was 'faking,' he could have called ahead so that paramedics would be waiting for him, called an ambulance as soon as he arrived at the jail, or returned to the police department and sought medical assistance there." We believe the opposite is true. Under normal circumstances, one who truly believes that an individual is faking illness will not go through the trouble of summoning help for the perceived actor. For instance, common experience teaches that a parent who believes that her child is feigning illness to avoid school will not rush the child to the emergency room. Thus, based on the facts of this case, and without record evidence to the contrary, Owen's failure to retake steps to aid Weaver supports only the inference that he did not draw the subjective belief that Weaver was in need of medical assistance.

therefore reversed on the issue of qualified immunity with regard to Weaver's Eighth Amendment claim.

## CONCLUSION

Weaver's Fourth and Eighth Amendment rights were not violated. Therefore, we **REVERSE** the ruling by the district court and **REMAND** for the court to grant summary judgment to the Officers in their individual capacities.

## CONCURRING IN PART, DISSENTING IN PART

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part. Because I agree that Officer Shadoan should have been granted qualified immunity in this case, I would reverse the district court's decision on that issue. However, I cannot agree with the majority's conclusion that Stephen Lamont Weaver's constitutional rights were not violated, and I would therefore affirm the district court's judgment with regard to Officer Owen.

The record reveals that neither officer saw nor otherwise had knowledge that Weaver had ingested cocaine. It is also undisputed that Weaver repeatedly denied swallowing any drugs. However, when Weaver became ill, the officers immediately summoned the paramedics, indicating that they did indeed suspect that he had swallowed the drugs. Officer Shadoan conceded that while waiting for the ambulance, he checked Weaver's heartbeat and breathing – another indication that Shadoan was concerned about Weaver's condition.

The record further reveals that Officer Shadoan's last dealings with Weaver were at the Oliver Springs Police Department after paramedics had been summoned to evaluate Weaver's medical condition. When Shadoan last saw Weaver, Weaver was alive and did not show any signs of illness. Based on these undisputed facts, I would reverse the district court's denial of qualified immunity for Officer Shadoan on the plaintiff's Fourteenth Amendment claim.

Officer Owen's actions require a different analysis, however, because he alone transported Weaver to the Morgan County Jail in Wartburg, some distance from Oliver Springs. Taking the plaintiff's allegations as true, it appears that Weaver began to get sick and throw up within five minutes of

leaving the police station in Oliver Springs. Despite having just been told by the paramedics, "*If you see any other problems or anything at all changes, call us back*," Owen continued on the 20-25 minute drive to Wartburg. He could have, but did not, call ahead for medical assistance; he could have, but did not, return the short distance to the Oliver Springs police department; he could have, but did not, drive Weaver directly to an area hospital. As a result, by the time they arrived at the Morgan County Jail, Weaver was in such distress that he had to be carried from the car. Still, Owen did not request medical assistance for Weaver for another 15 minutes or more. Instead, he requested that one of the jailers, a certified EMT who was then his girlfriend and was later his wife, check on Weaver. She did so only by looking through the cell bars to see whether he was breathing. Owen did not call paramedics again for some 40 or 45 minutes after Weaver had first been seen by the paramedics in Oliver Springs.

Owen's failure to seek prompt medical assistance or advice when Weaver's condition deteriorated constitutes deliberate indifference because it was an unreasonable response to a known risk of serious harm. Owen asserts that he believed Weaver was "faking" his illness, but surely police officers are not free to substitute their own judgment for that of medical professionals when there is already reason to believe that there is cause for concern.[1]

---

[1] It simply is not reasonable to believe that Weaver could be "faking" these symptoms in an attempt at escape despite the fact that he had tried to flee the police earlier at the arrest scene. Police officers may in some situations reasonably deduce that a prisoner is feigning symptoms and wait to provide medical assistance until they have brought the prisoner to a secure location. That is not the case here. In response to Weaver's physical distress, Owen did not simply make an initial decision not to seek immediate medical assistance, but instead deliberately ignored medical advice that he had already been given regarding Weaver. Additionally, if he truly believed Weaver was "faking," he could have called ahead so that paramedics would be waiting for him, called an ambulance as soon as he arrived at the jail, or returned to the police department and sought medical assistance there. Any of these actions would have secured

Furthermore, there can be no question that such "deliberate indifference to [Weaver's] serious medical needs" was a violation of his constitutional right to be free from cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). While this right is often expressed as a matter of Eighth Amendment jurisprudence, the protection it affords is not limited to those who are incarcerated after conviction, but also applies pursuant to the Fourteenth Amendment to pre-trial detainees. *See DeShaney v. Winnebago County Dep't. of Soc. Servs.*, 489 U.S. 189, 198 n.5 (1989); *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). Moreover, in this case, the requirement that the right must have been clearly established in a particularized sense has also been satisfied. *See Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972) ("where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness [to one who is incarcerated], the denial of such aid constitutes the deprivation of constitutional due process") (citations omitted).[2]

The fact that Weaver initially refused medical treatment does not alter this analysis. In *Scharfenberger v. Wingo*, 542 F.3d 328, 330 (6th Cir. 1976), we held that "a prisoner's

---

medical assistance for Weaver without creating an undue flight risk, yet Owen pursued none of them.

[2] Fitzke was arrested following an automobile accident and was incarcerated in the local jail. He was held from about 1:30 a.m. until 6:30 p.m. the same day -- a period of about 17 hours -- before he received requested medical treatment. During that time he suffered from a serious brain injury and complained of pain and numbness in various parts of his body. 468 F.2d at 1074-75. Fitzke alleged that the delay in receiving medical treatment increased the severity of his brain damage. *Id.* This court found that there was precedent for Fitzke's claim that his treatment constituted a cause of action under 42 U.S.C. § 1983, holding that "under exceptional circumstances the failure to provide or permit access to medical care may give rise to a violation of one's Fourteenth Amendment rights [since] such refusal could well result in the deprivation of life itself." *Id.* at 1076 (internal quotation marks and citations omitted).

custodians cannot lawfully deny . . . adequate medical care even in instances of deliberate self injury." The right, then, does not turn on whether the incarcerated individual affirmatively seeks medical treatment but, rather, on the officers' awareness that medical treatment is necessary. Hence, in *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096-97 (6th Cir. 1992), we explicitly found that an incarcerated individual did not have a clearly established right "to be screened correctly for suicidal tendencies and . . . to have steps taken which would have prevented suicide," but we reiterated our prior holding that detainees *do* have a clearly established right "to adequate medical care . . . where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness." *Id.* at 1096 (*quoting Fitzke*, 468 F.2d at 1076).

The officers here, and Officer Owen in particular, were on notice that if Weaver developed additional symptoms, they should notify medical authorities immediately. In failing to do so, Officer Owen forfeited his right to the qualified immunity to which he would otherwise be entitled. I therefore conclude that the district court was correct in denying qualified immunity to Officer Owen on Weaver's Fourteenth Amendment claim and would affirm that portion of the district court's judgment.