RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LUANNA GROTE, Administrator of the Estate of Bradley Grote,

*Plaintiff-Appellant*,

*v.*

KENTON COUNTY, KENTUCKY; KENTON COUNTY FISCAL COURT; KENTON COUNTY DETENTION CENTER; TERRY CARL, Jailer; SARAH BELL; BRIAN JENNINGS, ALEXANDER BROWN, and AARON BRANSTUTTER, Corrections Deputies; JASON RUSSELL, Sergeant; UNKNOWN ADDITIONAL DEPUTIES; CAITLIN BRAND; SOUTHERN HEALTH PARTNERS; UNKNOWN EMPLOYEE,

*Defendants-Appellees*.

> No. 23-5133

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:20-cv-00101—William O. Bertelsman, District Judge.

Decided and Filed: October 26, 2023

Before: MOORE, GIBBONS, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Gary F. Franke, GARY F. FRANKE CO. LPA, Cincinnati, Ohio, for Appellant. Christopher S. Nordloh, OFFICE OF THE KENTON COUNTY ATTORNEY, Covington, Kentucky, for the Kenton County Appellees. Judd R. Uhl, Aimee E. Muller, LEWIS BRISBOIS BISGAARD & SMITH, LLP, Cincinnati, Ohio, for Appellees Southern Health Partners and Caitlin Brand.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.    Bradley Grote died of acute methamphetamine intoxication three days after his arrest and detention at the Kenton County Detention Center in Covington, Kentucky.  Although Grote was visibly in distress when put in a booking cell at the jail, the jail's medical provider failed to render any treatment at all or seek further medical attention from a doctor on call or emergency medical services.  Grote's case exposes myriad failures by county and jail officials, including a lack of basic knowledge concerning overdoses and how to respond to them.  Under the facts of this case, we hold that a jury could find that the medical provider was deliberately indifferent to Grote's need for medical attention, but not that the jail deputies acted unconstitutionally.

We **REVERSE IN PART** and **AFFIRM IN PART**.

**I.  FACTUAL BACKGROUND**

**A.  Grote's Arrest and Time at the Kenton County Detention Center**

Covington police officer Sam Matthews arrested Bradley Grote for possession of methamphetamine and tampering with evidence on July 19, 2019, following a traffic stop. R. 116-2 (Matthews Dep. at 8:13–10:15) (Page ID #749–51); R. 116-3 (Citation) (Page ID #827).  Prior to arresting Grote, Matthews witnessed Grote throw several objects out of the vehicle.  R. 116-2 (Matthews Dep. at 8:13–10:15) (Page ID #749–51).   Upon further investigation, Matthews discovered that these items included a syringe and a bag of methamphetamine.  *Id.*  Matthews did not find any drugs on Grote's person during any searches incident to the arrest, nor did he observe Grote ingest any drugs.  *Id.* at 18:20–19:1 (Page ID #759–60).  Following the arrest, Matthews proceeded to transport Grote to the Kenton County Detention Center ("KCDC").  *See generally* Video 8.  The pair arrived at the detention center around 3:57 p.m.  *Id.* at 1:03.

Once at the detention center, Alexander Brown—a jail deputy—met Grote and Matthews to complete a custody transfer. *Id.* at 1:05. Brown asked Grote whether he would be coming off of any drugs or detoxing, to which Grote answered no. *Id.* Brown noticed that Grote was sweaty when he initially brought Grote into the jail. R. 116-7 (Brown Dep. at 8:7-16) (Page ID #927). But because it was summer, Brown initially attributed this to the heat. *Id.* Still, Brown observed that "once brought in, [Grote's] behavior kind of turned a little bit." *Id.* at 8:18–19. That is, in assessing Grote and conducting an unclothed search, Brown noticed that "the sweating progressed, the shaking, like the agitation looked progressed." *Id.* at 9:14–16 (Page ID #928).

As part of the booking process, Grote completed certain forms with booking clerk Sarah Bell. R. 116-6 (Medical Questionnaire at 1) (Page ID #919). On an initial medical questionnaire, Grote denied having ingested "potenti[]ally dangerous levels of drugs or alcohol." *Id.* After completing this questionnaire, officers at the jail strip-searched Grote, but did not find any drugs or contraband on his person. *See* Video 13. After the strip search, Grote returned to the booking area. *See* Video 9.

After returning to the booking area, Grote began exhibiting visible signs of distress. *Id.* at 4:22–30. He attempted to complete certain paperwork while standing, but could not do so due to his agitated state. *Id.*; *see also* R. 129-4 (Inmate Rules Form at 1) (Page ID #2109); R. 129-5 (Insurance Verification Form at 1) (Page ID #2110); R. 129-6 (Consent for Treatment Form at 1) (Page ID #2111); R. 129-7 (Authorized Representative Form at 1) (Page ID #2112) (forms all incomplete to varying degrees). Over the next several minutes, Grote twitched; fidgeted; and could not otherwise hold still, oscillating between putting his arms on his head or head in his hands. Video 9 at 4:22–30. Grote was not photographed while being booked, due to his agitated state. R. 116-7 (Brown Dep. at 14–15) (Page ID #933–34). And due to Grote's behavior at this time, Brown requested a medical assessment. *Id.* at 10:14–22 (Page ID #929).

Nurse Caitlin Brand, a licensed practical nurse employed by Southern Health Partners, then made her way to booking, and arrived at around 4:30 p.m. Video 1 at 0:00. By this point, Grote's condition had deteriorated markedly. *Id.* He was constantly shaking and twitching, appearing to lack meaningful control over his bodily movements. *Id.* at 0:00–2:00. He could not

sit still at all while Brand attempted to take his vital signs. *Id.* at 3:30. By then, Grote was covered in sweat. *Id.*

Brand testified that upon arriving for the medical assessment, she recognized that Grote was behaving in an erratic fashion, including by twitching and being irritable. R. 116-13 (Brand Dep. at 99:2–13) (Page ID #1403). Grote told Brand that he had taken a half gram of methamphetamine. *Id.* at 19:24–25 (Page ID #1323). Brand then tried to take Grote's blood pressure; however, she was unable to do so because he was twitching and unable to hold still. *Id.* at 100:11–22 (Page ID #1404). Eventually, Brand was able to take certain vital signs, including Grote's oxygen levels. *Id.* at 101:14–25 (Page ID #1405). Grote's oxygen level registered at 89 percent, and he was hyperventilating. *Id.* at 104:8–18 (Page ID #1408). Brand never took any other vital signs from Grote, including his temperature. *Id.* at 101:14–103:8 (Page ID #1405–06). At this point, Grote's sweating was "noticeable." *Id.* at 102:19 (Page ID #1406).

Brown was present when Brand conducted the medical assessment. R. 116-7 (Brown Dep. at 12:8–10) (Page ID #931). And Brown heard Grote tell Brand that he had ingested a half gram of methamphetamine at noon. *Id.* at 13:7–10 (Page ID #932). While present during the assessment, Brown knew that Brand was unable to take all of Grote's vital signs. *Id.* at 14:12–14 (Page ID #933). At the end of the medical assessment, Brand told Brown to keep a close watch on Grote, and to do periodic ten-minute check-ins on Grote in his cell. *Id.* at 16:12–22 (Page ID #935).[1]

Deputy Brian Jennings, another staff member, also interacted with Grote when Grote was being booked at the jail. Jennings asked Grote whether he had "taken anything" because, based on prior interactions with Grote, Grote was "not behaving the way he normally would." R. 116-17 (Jennings Dep. at 15:12–20) (Page ID #1603). Jennings observed that Grote "was real jittery" and that "[h]is pupils were dilated." *Id.* at 16:8–9 (Page ID #1604). "He was sweating. Very fidgety." *Id.* at 16:11. When Jennings asked Grote whether he had taken any substances, Jennings advised Grote that he was asking only out of concern for his health and was not going

---

[1]There appears to be an issue of fact concerning whether Brand told the deputies to conduct checks every ten minutes, or whether she stated that they should do them every ten to fifteen minutes. *Compare* R. 116-7 (Brown Dep. at 16:12–22) (Page ID #935), *with* Video 1 at 8:55.

to charge him based on his answers. *Id.* at 16:15–17:6 (Page ID #1604–05). Still, Grote denied that he had taken any substances. *Id.*

Brand determined based on Grote's behavior and symptoms that he was detoxing, but not that he was overdosing. R. 116-13 (Brand Dep. at 100:21–101:9) (Page ID #1403–04). Brand did not, however, recall communicating to anyone else her assessment that Grote was detoxing. *Id.* at 101:9 (Page ID #1405). Brand decided that Grote should be taken to a cell following her attempts to take his vital signs. Video 1 at 4:42. Grote then was relocated to a booking cell accompanied by deputies and Brand. *Id.* at 4:55.

Brand accompanied Grote to his cell with Brown, observed that Grote "was laying down on [a] raised concrete slab" in the cell and breathing heavily and rapidly, and instructed deputies to conduct observation checks. R. 116-13 (Brand Dep. at 104:8–106:25) (Page ID #1408–10). During his initial time in the cell, Grote remained visibly shaking and hyperventilating as Brand administered supplemental oxygen. Video 1 at 7:00. Brand and the deputies left the cell at 4:40 p.m. *Id.* at 9:15.

Brand did not check up on Grote during the next hour. R. 116-13 (Brand Dep. at 106:20–22) (Page ID #1410). Brand never determined what in fact caused any of Grote's symptoms—including his sweating, his erratic behavior, his twitching, and his agitation. *Id.* at 115:3–22 (Page ID #1419). After Brand and the deputies left the cell, the deputies conducted periodic check-ins on Grote by walking by the cell and looking into the cell. *See* Video 11. The deputies conducted these check-ins at 4:50 p.m., 4:55 p.m., and 5:12 p.m. *Id.* During the 5:12 p.m. check-in, both Jennings and Brown appeared to speak with Grote through the cell door. *Id.* The deputies did not conduct another check until nearly 5:36 p.m., following an alert by an inmate that Grote was suffering a seizure in his cell. *Id.*[2]

---

[2]The terms "seizure" and "seizing" are subject to numerous meanings. Specifically, following the alert by the inmate, Brown found Grote unconscious and foaming at the mouth. *See* Video 4; R. 116-7 (Brown Dep. at 27:6–15) (Page ID #946). The parties refer to this condition as a "seizure." Grote's hospital discharge records show that he suffered from multiple cardiac arrests, and that he did not regain any neurological function before dying. R. 129-10 (Hospital Records at 48, 51, 78) (Page ID #2166, 2169, 2196).

Grote's expert, Dr. Keller, opined that Grote was clearly in distress when being assessed by Brand, including that he was covered in sweat and restless. R. 116-19 (Keller Rep. at 3) (Page ID #1644). His respiratory rate exceeded 40 breaths per minute. *Id.* By the time Brand attempted again to take vital signs from Grote while in his cell, the rate had climbed to greater than 50 breaths per minute. *Id.* Based on the indications of distress, Dr. Keller noted that Grote's overdose would have been obvious to a layperson, and that such situation would have called for urgent medical care. *Id.* at 4–5 (Page ID #1645–46). Moreover, Keller opined that the failure to document medical checks every ten to fifteen minutes and failure to report findings back to medical providers may have prevented deputies from discovering that Grote had deteriorated and prevented them from seeking emergency medical care earlier. *Id*. at 5 (Page ID #1646).

Upon being alerted to the fact that Grote was suffering a seizure, correctional staff paged Brand for a "Signal 6"—*i.e.*, a medical emergency. R. 116-13 (Brand Dep. at 66:9–15) (Page ID #1370); R. 116-7 (Brown Dep. at 23:11–15) (Page ID #942) (Brown testifying that he called the Signal 6). Various staff and Brand responded to the Signal 6 and arrived at Grote's cell within minutes. *See, e.g.*, Video 4 at 1:00. By this point, Grote was unconscious and lying on his back in the cell, and Brand began providing treatment, including administering an ammonia inhalant and clearing fluids from Grote's mouth. *Id.* at 3:00. Jason Russell, the jail's shift commander, responded to the Signal 6, and after conferring with Brand, called a master control operator at the jail and directed the operator to call 911 for the medical emergency. R. 116-10 (Russell Dep. at 74:10–75:19) (Page ID #1157–58). Brand continued to administer basic treatment for approximately fifteen minutes. Video 4 at 18:00. At that point, outside emergency medical staff arrived; suctioned Grote's airway; and transported him to a hospital. *Id.* at 25:00. In all, eighteen minutes elapsed between the notification that Grote was suffering a seizure and emergency medical services removing Grote from the cell.

Three days later, Grote died of acute methamphetamine intoxication. R. 129-11 (Death Certificate at 1) (Page ID #2197). The autopsy indicated that Grote had a blood methamphetamine concentration of 7.57 mg/L—fourteen times higher than "the lowest reported lethal dose." R. 137 (Akpunonu Report at 3) (Page ID #3164).

**B.  The Relevant Policies[3]**

Brown, like other KCDC defendants, testified that he received no training on recognizing signs of an overdose.  R. 116-7 (Brown Dep. at 13) (Page ID #932).  Nor did he ever receive training on recognizing a detox.  *Id.*; *see also* R. 116-20 (Branstutter Dep. at 37:24–38:4) (Page ID #1684–85) (same).  Likewise, jail staff testified that deputies were not trained to call 911 immediately in the event of an inmate overdose, but instead were to notify shift managers.  *See* R. 116-10 (Russell Dep. at 71:4–8) (Page ID #1154).  In the event of a medical emergency, correctional staff were to alert medical staff first, not to call 911 directly.  R. 116-21 (Carl Dep. at 50:3-23) (Page ID #1745).  Deputies also did not have the authority to transport an inmate experiencing a medical emergency directly to an outside medical facility; instead, the shift commander and medical staff were provided this authority.  *See* R. 116-20 (Branstutter Dep. at 38:5–14) (Page ID #1685).

KCDC policies and practices are enshrined in a comprehensive document called "Policy and Procedures for the Kenton County Detention Center."  R. 129-12 (Policy and Procedures) (Page ID #2199–2824).  Relevant here, Policy No. 3.2.15 § D.1 states:

> The "911" system will be activated for the purpose of securing additional emergency medical assistance and transportation of the prisoner to an area hospital by a[n] available basic life support provider.  The decision to activate the 911 Emergency Medical System will normally be made by the senior medical staff member treating an inmate at the scene, however nothing in this directive shall preclude any staff member from activating the 911 Emergency Medical System.

*Id.* at 391 (Page ID #2589).

---

[3]Both below and on appeal, Grote lists and discusses a number of apparent policies and Kentucky statutes. Much of this discussion is irrelevant, however, insofar as Grote does not appear to connect this plethora of polices to his claims brought under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  The policies that Grote does contend give rise to *Monell* liability are failures to train jail staff with respect to (1) identifying overdoses; and (2) properly calling for emergency medical treatment.  *See* R. 129 (Opp. to Mot. for Summ. J. at 41–42) (Page ID #2094–95).  We focus only on those issues.

**C.  The Proceedings Below**

On July 17, 2020, the Estate of Bradley Grote[4] filed a complaint against Brand, her employer Southern Health Partners, and the Kenton County Defendants—a group comprised of individual jail staff and Kenton County—for violations of Grote's constitutional rights under 42 U.S.C. § 1983.  R. 1 (Compl.) (Page ID #1–36).  The thrust of the complaint is that the defendants exhibited deliberate indifference to Grote's medical needs by failing to provide adequate medical care, *id.* ¶¶ 133–35 (Page ID #24), and that Southern Health Partners and Kenton County are also liable for such harm, *id.* ¶¶ 138–41, 164–95 (Page ID #25, 29–34).  On June 30, 2022, the Kenton County Defendants moved for summary judgment on all of Grote's claims, R. 116 (Kenton County Mot. for Summ. J.) (Page ID #707–09), and Brand and Southern Health Partners followed suit on September 16, 2022, R. 137 (SHP Mot. for Summ. J.) (Page ID #3094).  The district court granted the defendants' motions for summary judgment on January 23, 2023, and declined to exercise supplemental jurisdiction over any state-law claims.  R. 157 (Op.) (Page ID #3906–49).  Specifically, the district court found that Brand was not deliberately indifferent because she was not aware of the fact that Grote had ingested a lethal amount of methamphetamine, and thus that she mistakenly concluded that he was suffering from withdrawal, *id.* at 18–19 (Page ID #3923–24); that Grote failed to prove that Southern Health Partners failed to train Brand, *id.* at 24–28 (Page ID #3929–33); that the individual county defendants were not deliberately indifferent to Grote because they reasonably responded once an objectively serious medical need existed, *id.* at 30–35 (Page ID #3935–40); and that Grote failed to prove that Kenton County failed to train its employees, *id.* at 36–41 (Page ID #3941–46).  In the alternative, the district court found that qualified immunity was appropriate for the individual Kenton County Defendants.  *Id.* at 41–43 (Page ID #3946–48).  The district court dismissed Grote's state-law claims without prejudice.  *Id.* at 43–44 (Page ID #3948–49).  Grote timely filed his notice of appeal on February 14, 2023.  R. 159 (Notice of Appeal) (Page ID #3951).

---

[4]Although the Estate brings this action on behalf of Grote, we refer to Grote as an individual throughout this opinion.

## II.  DISCUSSION

### A.  Standard of Reviews

We review de novo a grant of summary judgment, construing the evidence "in the light most favorable to the nonmoving party." *Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023) (quoting *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017)).  A grant of summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### B.  Deliberate Indifference

#### 1.  Applicable Law

The standard in this circuit to prove a deliberate-indifference claim brought under the Fourteenth Amendment by a pretrial detainee is clear.  To make out such a claim, a plaintiff must demonstrate (1) an objectively serious medical need; and (2) that the defendants, analyzed individually, acted (or failed to act) intentionally and either ignored the serious medical need or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed." *Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting *Brawner v. Scott County*, 14 F.4th 585, 597 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 84 (2022)).  Stated differently, a pretrial detainee must have a serious medical need, and the defendant must act, whether through intentional action or omission, recklessly in response to the need and the risk it presented to the detainee. *See Helphenstine* 60 F.4th at 317.

This has been the law of the circuit since at least 2021, when we explained that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), necessarily alters our approach to deliberate-indifference claims for pretrial detainees. *See Brawner*, 14 F.4th at 596.  Specifically and in line with *Kingsley*, we held in *Brawner* that the level of culpability with which a defendant must act to establish deliberate indifference to pretrial detainees is lower than that necessary for convicted incarcerated individuals. *Id.*  This is so because a pretrial detainee's claims derive not from the Eighth Amendment, with its focus on punishment, but instead from the Fourteenth Amendment, which can be violated without respect to an official's state of mind.

*Id.* Contrary to deliberate-indifference claims brought under the Eighth Amendment, which requires both an official's awareness of facts suggesting a likelihood of substantial harm to an incarcerated person and an official actually connecting such facts to an inference of harm, *id.* at 591, a pretrial detainee need only prove "something akin to reckless disregard" to satisfy the second element of a deliberate-indifference claim, *id.* at 596 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)).

Through no fault of its own, the district court applied the discussion from *Trozzi v. Lake County*, 29 F.4th 745 (6th Cir. 2022), in analyzing Grote's deliberate-indifference claims. *See* R. 157 (Op. at 18) (Page ID #3923). *Trozzi* stated that in order to prove a deliberate-indifference claim under the Fourteenth Amendment, a plaintiff must show that

> (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

*Trozzi*, 29 F.4th at 757–58. But *Trozzi* is at odds with the precedent that precedes it, and thus does not control. *See Helphenstine*, 60 F.4th at 316 ("We hold that [*Trozzi*'s] framing of the elements is irreconcilable with *Brawner*."). Contrary to *Brawner*, *Trozzi*, with its focus on what an official actually knew and whether the official ignored known risks, attempted to resurrect the pre-*Brawner* (and pre-*Kingsley*) treatment of pretrial detainees' deliberate-indifference claims. *Helphenstine*, 60 F.4th at 316. *Trozzi* stands alone in this regard, and we have rightfully rejected it. *See, e.g.*, *Howell v. NaphCare, Inc.*, 67 F.4th 302, 311 n.3 (6th Cir. 2023) (following *Brawner* and *Helphenstine* and rejecting *Trozzi*'s test which "is nearly identical in substance" to that held inapplicable to pretrial detainees in the earlier decision in *Brawner*). In line with *Brawner*, *Helphenstine*, and *Howell*, we analyze the claims on appeal under the proper Fourteenth Amendment test.

**2. Objectively Serious Medical Need[5]**

The district court found that Grote did not have an objectively serious medical need until Grote's seizure in his cell. R. 157 (Op. at 32) (Page ID #3937). Grote argues that the district court erred in making this finding, and instead he contends that he had an objectively serious medical need well before the seizure, including when he showed signs of medical distress while in the booking area prior to being placed in an observation cell. Appellant Br. at 47–48.

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)). There are a number of ways to show that the need for a doctor's care was sufficiently obvious. For one, external signs of internal distress can indicate to a layperson that a detainee has a serious medical need. *See, e.g.*, *Blackmore*, 390 F.3d at 899 (vomiting is "a clear manifestation of internal physical disorder"); *Est. of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (manifestation of "the classic signs of an impending heart attack" was a sufficiently serious medical need). On numerous occasions we have held that drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen. *See, e.g.*, *Burwell v. City of Lansing*, 7 F.4th 456, 464 (6th Cir. 2021) (cataloguing examples and explaining that detainee manifested clear signs of medical distress associated with overdosing, including being "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly"); *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (elevated blood-alcohol content and history of withdrawal seizures constitute objectively serious medical need); *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (signs of detoxing from heroin, among others, were obvious signals of serious medical need). And jailers' responses to a detainee's symptoms or complaints may also show that jailers recognized a serious medical need. *See, e.g.*, *Helphenstine*, 60 F.4th at 318 (jailer's placing detainee in observation cell following detainee vomiting indicated that medical need was obvious to a layman).

---

[5]Brand and Southern Health Partners do not dispute that Grote had an objectively serious medical need.

Based on this precedent, the district court erred when it found that Grote did not present an objectively serious medical need until he was found in his cell unconscious and foaming at the mouth. Although the Kenton County Defendants were not aware that Grote had ingested a lethal amount of methamphetamine, Grote manifested clear and undeniable signs of distress during the booking process shortly after arriving at KCDC. Nearly every corrections officer with whom Grote interacted noticed that Grote was experiencing some sort of medical issue, even if the cause was unknown. *See, e.g.*, Video 9 at 4:22 (showing Grote unable to complete booking paperwork while in presence of various officers, due to persistent twitching); *id.* (showing Grote unable to sit still while in booking, and constantly putting hands on his head). If there were any doubt about Grote's distress, Brown confirmed that he harbored concerns based on this behavior; indeed, he requested a medical assessment. R. 116-7 (Brown Dep. at 10:14–18) (Page ID #929).

Grote's outward signs of distress only increased from that point. By 4:30 p.m., when Brand arrived for the medical assessment, Grote could not sit still at all. Video 1 at 0:00. He was covered in sweat, and shaking so much that Brand could not take all of his vital signs. *Id.* at 0:00–2:00. Brand made the call to send Grote to a cell for *medical* observation and administered supplemental oxygen. *Id.* at 7:00. By the time Grote was in the cell, accompanied by Brand and corrections staff, he was hyperventilating and could only lie down. *Id.* Dr. Keller opined that these signs of distress, including the heightened respiratory rate, would have been obvious to a layman. R. 116-19 (Keller Rep. at 3) (Page ID #1644).

These signs constitute the hallmarks of an objectively serious medical need. There were signs of outward distress, *see Blackmore*, 390 F.3d at 899; clear indications of *either* a drug overdose or severe withdrawal, *see Burwell*, 7 F.4th at 464; and the deputies themselves recognized the need for a medical assessment and participated in the medical observation, *see Helphenstine*, 60 F.4th at 318. The district court appears to have conflated the more subjective element of a deliberate-indifference claim with its objective element in reaching the opposite conclusion—that Grote did not have a serious medical need until he visibly suffered a seizure in his cell. Specifically, the district court relied on the facts that (1) no one knew that Grote had ingested a lethal amount of methamphetamine; and (2) "seven people observed [Grote] and none of them concluded he had a serious medical need." R. 157 (Op. at 31–32) (Page ID #3936–37).

But the latter point threatens to swallow the entire objective component of the deliberate-indifference inquiry by making the serious-medical-need prong coextensive with a defendant's own understanding of the situation and reaction to it. And the former point is irrelevant with respect to whether an *objectively* serious medical need existed. Even when it comes to the recklessness component of deliberate indifference, "our case law does not require that the officer correctly diagnose the cause of the distress." *Burwell*, 7 F.4th at 475 (surveying cases). In *Burwell*, we held that the plaintiff had an objectively serious medical need and that certain defendant-officers acted with reckless disregard despite the plaintiff denying drug use, because the officers' lack of knowledge about any actual drug use did not undermine the plaintiff's visibly outward signs of medical distress. *Id.* at 474.

That Grote denied ingesting methamphetamine may factor into how we consider the defendants' responses to Grote's medical distress but is irrelevant when assessing whether Grote had a serious medical need, given the manifest signs of distress obvious to a layman. Contrary to the Kenton County Defendants' position, *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009), does not compel a different outcome. KCDC Br. at 11. In *Spears*, we held that the plaintiffs failed to establish a sufficiently serious medical need when emergency medical technicians and a jail nurse concluded that the detainee did not require transport to a hospital. 589 F.3d at 255. The facts of *Spears*, however, are inapposite. The detainee there showed no signs of visible distress from crack cocaine use, other than hallucinations. *Id.* at 254–55. Emergency medical technicians cleared the detainee for transport to the jail and determined at the scene of the arrest that he did not need to go to a hospital. *Id.* at 252. And a jail nurse, like the EMTs, "administered tests" based on the detainee's behavior, and found nothing concerning. *Id.* at 255. Based on the lack of outward signs of distress and the conclusions of medical personnel, we held that the plaintiffs failed to establish an objectively serious medical need because such need "was not obvious to trained medical personnel." *Id.*

By contrast, here Grote exhibited signs of serious medical issues, and Brand was the only medical provider to have examined Grote. Brown called for Nurse Brand to conduct a medical assessment, and officers witnessed Grote's deterioration over time. Although Brand and the Kenton County Defendants were not aware of the *cause* of the medical distress, they could tell

that Grote required extra observation, that he was shaking and twitching, and that he lacked basic motor control. At a minimum, disputes of material fact exist concerning the obviousness of the medical need prior to Grote's seizure.

### 3. Reckless Disregard

Because the district court determined that Grote did not have a serious medical need until he was found unconscious and foaming at the mouth in his cell, it began its analysis of the post-*Brawner* reckless-disregard element of Grote's deliberate-indifference claim against the Kenton County Defendants too late in the sequence of events. The district court did, however, assess whether Brand disregarded the risk to Grote, because Brand and SHP conceded that an objectively serious medical need existed throughout Grote's time at KCDC. R. 137 (SHP Mot. for Summ. J. at 9) (Page ID #3102) ("These defendants do not dispute the first element of the deliberate indifference test.").

#### a. Nurse Brand

At bottom, Grote argues that Nurse Brand acted recklessly in response to Grote's serious medical need, by failing, for instance, to contact appropriate healthcare providers and arrange for Grote's timely transport to an outside medical facility for treatment. Appellant Br. at 37.[6] The district court found that Brand was not deliberately indifferent in the face of Grote's medical need, based on her lack of knowledge of Grote's ingestion of a lethal dose of methamphetamine. R. 157 (Op. at 18–19) (Page ID #3923–24).[7] Because she was unaware of this fact, Brand claims that she mistook Grote's symptoms as "routine withdrawal" and could not have known that Grote would further deteriorate. *Id.*

---

[6]Grote additionally identifies myriad failures by Brand, including her failure to chart adequately Grote's condition or formulate a treatment plan. Appellant Br. at 33–37. Such failures were plainly negligent and a violation of standards of care. But Grote does not connect these failures to the harm he suffered, nor does he appear to contend that such failures caused Brand to delay medical care. Because Grote's theory appears to be that Brand needed to recognize that transport to an outside facility or consultation with a doctor was imperative, it is unclear why such failures impact the analysis in this *specific* factual scenario, although it is easy to imagine a circumstance in which a failure to chart and document adequately patients' medical conditions would create liability. We instead focus on whether Brand adequately responded to Grote's clear signs of medical distress.

[7]Because the district court applied the incorrect legal standard, we do not know whether it would have reached the same outcome applying the correct post-*Brawner* test.

Brand's "routine withdrawal" defense fails, particularly in light of our post-*Brawner* jurisprudence. Contrary to Brand's apparent position, Grote does not need to prove that Brand was aware of the fact that Grote had ingested a lethal dose of methamphetamine to show that Brand recklessly disregarded his serious medical need. The need for medical attention based on Grote's severe symptoms was obvious even to non-medical professionals, and Brand's failure properly to appreciate that risk does not mean that she did not act recklessly. *See Burwell*, 7 F.4th at 475 ("[I]t does not matter whether [the officer] knew that [the detainee] was suffering from an overdose specifically as opposed to some other serious medical condition. There is no requirement that an officer correctly diagnose the cause of a detainee's obvious distress."). Even if Brand *thought* that Grote was going through withdrawal as opposed to overdosing, Grote's symptoms—uncontrollable shaking and hyperventilating, among others—were of such a magnitude that the need for action was obvious, whether that meant calling a doctor or immediately transporting Grote to emergency medical services. *See id.* at 474 ("[K]nowledge that Phillips had ingested drugs was unnecessary to alert Kelley to the fact that Phillips was in distress."); *Blackmore*, 390 F.3d at 900 (jury could find officers were deliberately indifferent because the "classic signs of appendicitis" demand medical treatment). One need not be a doctor to know that placing Grote on cell checks by jailers amounted to treatment "so cursory as to amount to a conscious disregard" of his clear medical needs. *Rouster v. County of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014).

In this respect, Grote's case is different than those in which we have held that a defendant's awareness of the detainee's drug use impacts the deliberate-indifference inquiry. For one, these cases precede *Brawner*, and focus heavily on the defendant-officers' states of mind. *See, e.g.*, *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 ("[I]t is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have* known that Watkins had swallowed drugs."); *Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) ("Plaintiff's contention that the [o]fficers 'believed' or 'should have known' that Weaver had swallowed drugs does not give rise to a deliberate indifference claim. It is equally plausible that the [o]fficers 'believed' that Weaver had tossed out the drugs as he fled from the police."). But post *Brawner*, we are concerned with whether a defendant acts recklessly in the face of a serious medical need and the risk to the detainee; a defendant need not diagnose the

cause of the medical distress in order for such need to indicate medical issues beyond the defendant's capability that require emergency care. *See Helphenstine*, 60 F.4th at 322 (holding that jury could conclude that doctor was deliberately indifferent, because doctor "knew that Helphenstine was in distress and knew that he needed treatment that only a hospital could provide"). This was the case for Brand, who could provide only the most basic medical care despite the obvious signs that Grote needed more.

Moreover, nothing in *Spears*, *Weaver*, or *Watkins* stands for the proposition that a defendant may escape liability by labeling clear outward signs of medical distress as something that they are not. In each of these cases, the incarcerated person denied ingesting drugs *and* the defendants' knowledge of whether the person ingested drugs was a critical piece of information necessary to appreciate the medical need. This was so because the medical distress was not obvious. *See Weaver*, 340 F.3d at 411 ("The paramedics' report clearly indicates that Weaver did not exhibit any symptoms of drug ingestion."); *Watkins*, 273 F.3d at 684–86 (defendants did not exhibit deliberate indifference to detainee, when detainee repeatedly denied ingesting drugs and provided rational explanations for his actions and later, complained that "his stomach was upset from drinking alcohol and smoking marijuana" because defendants were unaware of fact that detainee had swallowed drugs).[8] Again, Brand did not need to know whether Grote ingested a lethal amount of methamphetamine to recklessly disregard his medical need; whether he was withdrawing or overdosing, there is nothing routine about Grote's symptoms—uncontrollable shaking and hyperventilation, among others—that would suggest that no medical attention was necessary.

That Brand did not need to understand *why* Grote was experiencing medical distress, but instead simply see that he was *in fact* experiencing such distress, also differentiates this case from ones in which we have held that a misdiagnosis by a medical professional is not deliberate indifference. Generally, a mere misdiagnosis of a medical condition by a prison medical official, standing alone, will not constitute deliberate indifference. *Howell*, 67 F.4th at 313. But we have not held that a misdiagnosis shields a medical provider from liability when the detainee was in

---

[8]In both *Weaver* and *Watkins*, the detainee also denied medical treatment, which factored into the deliberate-indifference inquiry. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001); *Weaver v. Shadoan*, 340 F.3d 398, 403 (6th Cir. 2003).

clear medical distress of a magnitude requiring immediate emergency medical attention.  *See, e.g.*, *Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847, at *4 (6th Cir. Feb. 10, 2022) (no deliberate indifference when detainee "had stable (if slightly abnormal) vitals, appeared alert, and was able to catch himself while falling" and nurses misdiagnosed medical issues); *Jones v. Muskegon County*, 625 F.3d 935, 945 (6th Cir. 2010) (doctor's misdiagnosis based on weight loss and stomach pain, and treatment commensurate with that diagnosis, did not indicate deliberate indifference); *Rouster*, 749 F.3d at 451–52 (nurse not deliberately indifferent based on erroneous diagnosis of non-life-threatening alcohol withdrawal, when detainee presented with abdominal pain and more general agitation).  These cases elucidate the common-sense principle that if a medical professional is ignorant of "critical facts that should have caused her to interpret" a detainee's otherwise non-obvious symptoms "in a different light," then the provider may not be liable for a misdiagnosis.  *Howell*, 67 F.4th at 314.  Here, even if Brand determined that Grote was detoxing from methamphetamine, as opposed to overdosing, Grote's symptoms indicated that he needed medical attention that KCDC and SHP could not provide.  A jury could find that placing Grote on deputy-supervised observation in these circumstances amounted to treatment "so cursory as to amount to no treatment at all."  *Helphenstine*, 60 F.4th at 322 (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

What is more, the record is replete with disputes of material fact concerning whether the purported misdiagnosis of "routine" withdrawal was reasonable.  Dr. Keller opined that Grote "showed the classic signs and symptoms of methamphetamine intoxication and overdose." R. 116-19 (Keller Rep. at 4) (Page ID #1645).  Brand's expert, Dr. Akpunonu, stated that Grote's symptoms—agitation and akathisia,[9] among others—"are not specific to methamphetamine intoxication and could be the result of a variety of intoxicants, withdrawal syndromes, and psychiatric illness."  R. 137 (Akpunonu Report at 3) (Page ID #3164) (parentheticals omitted); *see also* R. 116-13 (Brand Dep. at 119:21–25) (Page ID #1423) (testifying that Grote's symptoms were consistent with withdrawal).  But nothing in Dr. Akpunonu's report indicates that Brand's misdiagnosis of Grote was well founded or that, based on the misdiagnosis, Brand provided adequate care.  As we routinely hold, these issues are best left to a jury.

---

[9]Akathisia refers to "an inability to remain still."  Jason Patel and Raman Marwaha, *Akathisia* (July 24, 2023), NIH NATIONAL LIBRARY OF MEDICINE, https://perma.cc/D6AM-FAND.

*See, e.g.*, *Darrah v. Krisher*, 865 F.3d 361, 370 (6th Cir. 2017) ("[T]he question of whether it was reasonable to continue to keep him on a drug that had proven ineffective and whether that course of treatment constituted deliberate indifference is a question best suited for a jury.").

Accordingly, the district court erred in granting Brand summary judgment on Grote's deliberate-indifference claim against her. A jury could find that Grote's medical distress was so obvious that Brand's failure to render any treatment and failure to take sufficient steps to address the medical emergency constituted plainly inadequate care.[10]

### b. Kenton County Defendants

The district court did not assess the constitutionality of the Kenton County Defendants' actions until Grote visibly suffered a seizure in his cell—*i.e.*, when the court determined that an "objectively serious medical need" arose. Grote does not suggest that, even taking the district court's starting point as a given, its analysis was otherwise incorrect. Instead, his argument is that (1) an objectively serious medical need existed well before the seizure; and (2) the Kenton County Defendants each recklessly disregarded the risk of harm to Grote. Appellant Br. at 46, 49. As discussed, we agree with Grote's contention as to the former point. But Grote's contentions fail as to the latter.

---

[10]Grote has also sued Southern Health Partners on a theory of failure to train and supervise. Appellant Br. at 37. The issue with this theory, however, is that Grote makes no attempt to connect any of the myriad factual assertions related to Brand's actions or lack of knowledge to the requirements of making out such a claim. Instead, Grote simply suggests that Brand was not knowledgeable on certain points. *Id.* at 37–39. As the district court found, a § 1983 claim against Southern Health Partners for inadequate training must satisfy several elements. R. 157 (Op. at 24–28) (Page ID #3929–33). Though Grote gestures toward such a claim by pointing out certain gaps in Brand's knowledge and her failure to comply with certain medical standards, Grote fails to tie these issues to inadequate training by Southern Health Partners; explain what tasks Brand was required to perform; explain how such failures caused Grote's injuries; or explain how any purported failure to train resulted from deliberate indifference. Because the focus of the inquiry for *Monell* liability here is the "adequacy of the training program in relation to the tasks the particular officers must perform," not an individual's own failures in the moment, Grote does not identify any reversible errors on this point by the district court. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Notwithstanding Grote's failures to articulate adequately this claim (or identify reversible errors by the district court), we do not mean to suggest that Brand was, in fact, trained adequately. In the district court, Grote highlighted our decision in *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015). *Shadrick* exposes myriad failures by Southern Health Partners to train its employees, "evidenced by the blanket inability of the LPN nurses who worked at [the detention center] to identity and discuss the requirements of SHP's written policies governing their work" and the company's failure "to clarify the proper course of conduct for nurses in instances of policy conflict." *Id.* at 740–41. Grote does not identify such failures here, but that does not mean that we endorse SHP's training of its employees or suggest that *Shadrick* illustrates the only way to prove a failure to train.

As an initial matter, there are certain issues common to all of the Kenton County Defendants that cut against holding that they recklessly disregarded Grote's medical need. Principally, Grote has not pointed to any record evidence to suggest that the Kenton County Defendants were aware of any information beyond that available to Brand during the approximately hour-and-a-half period between the time Grote entered KCDC and his seizure. Generally, "non-medically trained officer[s]" do not act with deliberate indifference to a detainee's medical needs when they reasonably defer to a medical professional's diagnosis or treatment. *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017). A mistaken, albeit reasonable, belief that such deference to a provider is warranted will not rise to the level of deliberate indifference. *Id.* Such deference is unreasonable in circumstances when the officer is aware of additional information concerning an incarcerated person's condition, or if the medical professional rendered their opinion prior to changed circumstances. Thus, in *Greene*, we held that defendant-officers' failure to seek any medical assistance rose to the level of reckless disregard for the detainee, because the detainee's condition continued to deteriorate in the hours following the professional's evaluation. 22 F.4th at 608–09. "At a certain point, bare minimum observation ceases to be constitutionally adequate." *Id.* at 609. Here, Grote has made no argument that the officers should have disregarded Brand's assessment of Grote's condition based on what they knew or observed.

In all, Grote presses claims against five individual county defendants, not including the KCDC jailer Terry Carl. These individuals are Alexander Brown, who brought Grote into KCDC, strip-searched him, observed Grote's agitated state, called Brand for a medical assessment, participated in certain of the observation checks of Grote, and initiated the Signal 6, R. 116-7 (Brown Dep. at 8:7–9:16, 18:2–19, 23:11–15) (Page ID #929, 937, 942); Aaron Branstutter, who was in the booking area on July 19, 2019, knew that Grote was under medical supervision but did not know why, and did not participate in the medical observation of Grote, R. 116-20 (Branstutter Dep. at 13:14–21, 17:22–24) (Page ID #1660, 1664); Brian Jennings, who was next to Grote when Grote could not complete his booking paperwork, asked Grote if he had taken any drugs, observed Grote sweating and being "fidgety," knew that Grote was on medical watch, at one point checked on Grote as part of the medical observation, and noted that his condition remained unchanged (*i.e.*, that he was sweating, was fidgety, and his pupils remained

dilated), R. 116-17 (Jennings Dep. at 15:1–17:6. 18:13–15, 20:12–21:9) (Page ID #1603–05, 1606, 1608–09); Jason Russell, who was generally aware of the fact that people routinely came to KCDC intoxicated, knew that Grote was agitated and could not have his photograph taken, and knew that Grote was under medical supervision, R. 116-10 (Russell Dep. at 56:22–57:16, 83:13–23) (Page ID #1139–40, 1166); and Sarah Bell, who was the booking clerk who attempted to complete Grote's booking, R. 116-5 (Bell Dep. at 30:13–17) (Page ID #858).

Beyond the initial issue that such officers may ordinarily reasonably defer to Brand's assessment of Grote, Grote hardly attempts to argue that any of these individuals recklessly disregarded Grote's medical need.  Again, the deliberate indifference inquiry is *individualized*; differently situated individual officers may be deliberately indifferent based on what they see, what they should have known, or their actions in response to a detainee's needs.  *Greene*, 22 F.4th at 607–08.  Yet Grote simply declares that "there are genuine issues of material fact whether [the defendants] failed to act reasonably by not seeking emergency medical treatment for Grote, and acted with deliberate indifference to Grote's serious medical needs."  Appellant Br. at 51, 52, 54, 55, 56.  Such boilerplate language begs the question of how a booking clerk like Bell was deliberately indifferent when her only interaction with Grote was during the few minutes during which he attempted to complete paperwork, or how Russell, who appears to have been only generally aware of Grote's progress through booking, recklessly disregarded a risk to Grote.

Brown and Jennings undoubtedly had more contact with Grote than others, and most closely observed his signs of distress.  But again, Grote does not argue that these officers should have disregarded Brand's advice pertaining to medical observation; that their checks on him were inadequate; or that something changed in the limited period between Brand directing them to place Grote on medical observation and the point at which Grote suffered a seizure in his cell.  Grote's shotgun approach to simply enumerating how the Kenton County Defendants interacted with Grote does little to show that they recklessly disregarded a risk to his health.

## C.  Municipal Liability[11]

Grote's final claim is one for municipal liability against Kenton County under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  The precise theory of municipal liability that Grote presses is somewhat convoluted.  Before the district court, Grote most clearly argued that Kenton County failed adequately to train jail officers on when to call 911 in the event of a medical emergency.  R. 129 (Opp. Mot. for Summ. J. at 42) (Page ID #2095).[12]  Accordingly, we, like the district court, will focus on that issue.  *See, e.g.*, *Jackson v. Ford Motor Co.*, 842 F.3d 902, 906 (6th Cir. 2016) (a party forfeits the right to have arguments first raised on appeal considered).

Preliminarily, we note that it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer.  In *City of Los Angeles v. Heller*, the Supreme Court stated that a damages award against a municipality is unwarranted "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."  475 U.S. 796, 799 (1986) (per curiam).  But we, as well as circuits across the country, have recognized that *Heller* does not preclude a finding of municipal liability even if no individual officer violated the Constitution where constitutional harm has nonetheless "been inflicted upon the victim" and the municipality is responsible for that harm.  *Epps v. Lauderdale County*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring); *see also, e.g.*, *North v.*

---

[11]Grote pays no mind to the fact that the district court determined that his claim of failure to train and supervisory liability against jailer Terry Carl conflated that claim with one for municipal liability.  R. 157 (Op. at 36) (Page ID #3941).  Instead, Grote once again presses this claim on appeal, without any mention of how the district court erred in considering the claim.  Appellant Br. at 56–68.  Grote's claim against Carl in his individual capacity has all the hallmarks of a claim for municipal liability—*i.e.*, a failure to train without some level of more direct involvement by Carl—and thus it cannot be maintained against an individual officer.  *Compare Peatross v. City of Memphis*, 818 F.3d 233, 243 (6th Cir. 2016) (holding allegations made out a claim against supervisor because allegations that supervisor "failed to train and supervise the officers to avoid the use of excessive force, failed to investigate the allegations of excessive force properly, and attempted to cover-up the unconstitutional conduct of his subordinates" showed that he "at least knowingly acquiesced in the unconstitutional conduct"), *with Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 977 (6th Cir. 2012) ("To attempt to hold John Doe liable in his individual capacity simply for his alleged failure to adequately train employees 'improperly conflates a § 1983 claim of individual supervisor liability with one of municipal liability.'" (quoting *Phillips v. Roane County*, 534 F.3d 531, 543 (6th Cir. 2008))).

[12]Grote also claimed that Kenton County maintained a "policy of providing inadequate medical treatment" without any further elaboration.  R. 129 (Opp. Mot. for Summ. J. at 41) (Page ID #2094).

*Cuyahoga County*, 754 F. App'x 380, 389–90 (6th Cir. 2018) (surveying circuits' approaches); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) (per curiam) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983."); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) ("*Heller* should not be read to require a plaintiff to show more than that a governmental policy or custom was the 'moving force' that led to the deprivation of his constitutional rights, the foundation for municipal liability.").

Our precedent has not been a model of consistency on this point. In *Winkler v. Madison County*, a panel, though considering the possibility of municipal liability despite no constitutional violations by individuals, raised the issue whether "a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is *liable* for having committed a constitutional violation." 893 F.3d 877, 901 (6th Cir. 2018) (emphasis added). This statement is imprecise; the potential for municipal liability notwithstanding an individual's lack of liability has always existed, as in cases when an individual officer receives qualified immunity. *See, e.g.*, *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) ("Under the law of this circuit, a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity."). Instead, the question is whether a municipality may be liable when no individual has committed a constitutional *violation*.

Moving past qualified immunity, there are still scenarios when no officer may have acted unconstitutionally, but the municipality has nonetheless inflicted constitutional harm on a victim. "In many cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also mean that the plaintiff has suffered no constitutional violation." *North*, 754 F. App'x at 390. But, as here, when the constitutional harm complained of relates to lack of action due to a failure to train, the municipality may still be liable. *See id.*; *see also, e.g.*, *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (considering whether municipality was liable for constitutional violation despite inability to hold any one doctor responsible because the plaintiff "contends . . . that the delays and confusion that caused his injury were caused by systemic problems in the health care system for the Cook County Jail that reflect deliberate indifference to

inmates' health needs as a matter of official custom, policy, or practice"). Rightfully, the parties, as well as the district court, did not simply conclude that Kenton County is not liable despite the lack of a constitutional violation by any individual defendant.

Applied here, Grote fails adequately to show that Kenton County is liable under *Monell*. As it relates to the 911 policy enshrined in the Policy and Procedures for the Kenton County Detention Center, Grote submits no evidence that Kenton County officials were inadequately trained on the policy or that they failed to follow the policy in this case. Instead, he appears to contend that the policy itself—which in the first instance directs officers to contact supervisors or medical staff in the event of an emergency—is unreasonable. Appellant Br. at 69. But this argument shows neither that the officers' training was inadequate for tasks that they needed to perform (tasks which, as the district court notes, Grote failed to identify), nor that the alleged inadequacy resulted from deliberate indifference. Moreover, because Grote relies on a failure-to-train theory and does not identify a pattern of similar constitutional violations, he can prove such deliberate indifference only by showing "'a single violation of federal rights, accompanied by a showing that [Kenton County] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Though Kenton County could certainly better prepare officers for situations in which not running medical emergencies up the chain is warranted, as in *Winkler* Grote does not explain how the officers' training was deficient or how such training would have made the possibility for a constitutional violation obvious. 893 F.3d at 903; *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

Finally, we previously noted that Grote erroneously directed a failure-to-train claim against Carl, when in actuality such claim is one for municipal liability. The premise of this claim is that officers did not receive adequate training on treating and recognizing drug overdoses. Appellant Br. at 62. But here again, Grote runs into the same issues. The record appears muddled with respect to whether the individual Kenton County Defendants in fact

received training related to substance abuse and overdose, *compare* R. 129-12 (Policy and Procedures at 525) (Page ID #2723) (noting that staff will receive training on "substance abuse and dependency") *with* R. 116-20 (Branstutter Dep. at 38:2–4) (Page ID #1685) (Branstutter testifying that he did not receive training on drug overdose) *and* R. 116-7 (Brown Dep. at 13:17–23) (Page ID #932) (same). Grote, however, does not contest the Kenton County Defendants' argument (accepted by the district court), that officers were adequately trained in recognizing basic medical emergencies and seeking medical attention when necessary. Brown sought medical attention for Grote, although Brand failed to provide adequate care. Lack of overdose and drug-related training can certainly create municipal liability where, for instance, officers are principally responsible for handling medical care. *See Helphenstine*, 60 F.4th at 324–25. But in circumstances like here, where officials are trained to recognize medical issues and have access to and do access medical providers, we have not held that a lack of more specific training with respect to medical issues presents an obvious risk of a constitutional violation. *See, e.g.*, *Winkler*, 893 F.3d at 903; *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019). At least in this particular instance, holding otherwise would contradict the general (though limited) principle that officers may reasonably rely on a medical provider's opinion. *See North*, 754 F. App'x at 390.

There is a certain risk that finding no municipal liability in a case such as this one may appear to condone a municipality's practices. This should not be the message. This case lays bare myriad issues in our jails and prisons even if in this narrow instance they do not rise to a constitutional dimension for the Kenton County Defendants. Undoubtedly, people will continue to die or be seriously injured in our jails and prisons without better training and greater resources for staff. The municipal defendants in this case recognize that overdoses and other drug-related issues are rampant in our jails and prisons. But those same facilities appear woefully unprepared to handle such issues, at least to a degree that would prevent needless death. Under a different set of facts, a municipality may be constitutionally liable.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE IN PART** and **AFFIRM IN PART** the district court's judgment. We **REMAND** for proceedings consistent with this opinion.